## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| TRUSTEES OF THE CHICAGO PAINTERS AND DECORATORS PENSION, HEALTH AND WELFARE, DEFERRED SAVINGS, APPRENTICESHIP, SCHOLARSHIP, AND JOINT COOPERATION TRUST FUNDS, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | No. 07 C 4236 |
| | ) ) | Judge Joan H. Lefkow |
| v. | ) ) | |
| DESTINY DECORATORS. INC., an Illinois corporation, and DANIEL McDUFFIE, individually, | ) ) ) ) | |
| Defendants. | ) ) | |

## OPINION AND ORDER

Plaintiffs, Trustees of Chicago Painters ("Trustees") and Decorators Pension, Health and

Welfare, Deferred Savings, Apprenticeship, Scholarship, and Joint Cooperation Trust Funds

("the Funds"), filed this suit against defendants, Destiny Decorators, Inc. ("Destiny") and Daniel

McDuffie ("McDuffie"), to recover allegedly delinquent contributions to the Funds pursuant to

Section 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), as

amended, 29 U.S.C. §§ 1132(g)(2) and 1145, and to pierce the corporate veil to hold McDuffie

personally liable for the alleged delinquent contributions.[1]  This court has jurisdiction under 29

U.S.C. §185(a), as amended, and 29 U.S.C. § 1132.  Before the court are the parties' cross-

---

[1] Under Section 502(a)(3) of ERISA, a participant, beneficiary or fiduciary may bring an action to enjoin any act or practice which violates ERISA provisions or obtain equitable relief to redress such violations or enforce any provision of ERISA or the terms of the plan.  29 U.S.C. § 1132(a)(3).  Under Section 301 of Labor Management Relations Act, suits may be brought by a labor organization for violation of contracts between an employer and the labor organization representing the employees.  The Funds have standing to pursue this action against the defendants as third-party beneficiaries to the CBA.

motions for summary judgment. For the reasons set forth below, the court grants plaintiffs' motion [#47] and denies defendants' motion [#50].

**RELEVANT FACTS[2]**

Destiny is party to a collective bargaining agreement between Painters District Council No. 14 of the International Union of Painters and Allied Trades and its affiliated locals ("District No. 14") and the Painting and Decorating Contractor's Association, Chicago Council ("the Association"). This collective bargaining agreement ("CBA")[3] binds Destiny to trust agreements that establish the Funds. Together, the CBA and the trust agreements require Destiny to submit, based on an employee's hourly wage, various fringe benefit contributions and union dues to the Funds on behalf of bargaining unit employees who do the type of work specified in the CBA within the territorial jurisdiction of District No. 14.

Article III, Section 1 of the CBA defines "bargaining unit" as

> all journeymen, apprentice and painters, decorators, paperhangers, drywall tapers and applicators using tools of the trade to apply or remove materials used for or preparatory to decorating or protecting surfaces, who are employed to do such work by the present and future Employer members of the Association in that area of Chicago, Cook, Lake, Will and Grundy Counties, Illinois, and whatever additional jurisdiction may be awarded the Union, and such other work over which the Union may hereafter acquire jurisdiction.

*Id*.

---

[2] The facts set forth in this section are derived from the statements of fact submitted by the parties to the extent they comport with Local Rule 56.1, as discussed *infra* at 9.

[3] The CBA is attachment A to the Fitzmaurice Aff., Ex. 5 to Pls.' L.R. 56.1 SoF (referred to in the text as "Fitzmaurice Aff.").

## I.    The Vargas Audit

To determine whether Destiny was making the required contributions for all covered painting work performed by bargaining unit members, the Funds hired Benjamin Vargas ("Vargas") to perform a compliance audit on Destiny for the time period covering October 1, 2005 through August 31, 2007.  Vargas requested payroll records, personnel records, tax returns and cash disbursement records from Ringold Financial, Destiny's accountant, and from Destiny itself.  Vargas testified that he was only given some payroll check copies, some payroll reports and state quarterly unemployment returns.  Deposition of Benjamin Vargas 28:11-18, Sept. 26, 2008, attached as Ex. 13 to Pls.' L.R. 56.1 SoF (hereinafter "Vargas Dep.").  He further testified that he did not receive any W-2s, 1099s, time cards, certified payroll documents, cash disbursement records, Destiny's general ledger, or company invoices.  *Id.*

Unsatisfied with Destiny's record keeping, the Funds filed the current action and subpoenaed the missing documents.  Through the subpoena, Vargas obtained, *inter alia*, copies of canceled checks from two bank accounts, one at Charter One Bank and one at First American Bank.  It is undisputed that the Charter One account was used by Destiny for business purposes; however, as discussed below, the parties dispute whether the First American account was another Destiny business account or McDuffie's personal account.

In conducting the audit, Vargas found that the First American checks did not correspond with the payroll records provided by Destiny.  Some of the First American checks were issued to Destiny employees who were on the Destiny payroll at the relevant time, others were issued to payees who did not appear anywhere in Destiny's records, and others were written to "cash."  None of these checks appears in Destiny's records, and neither Destiny nor McDuffie has any record or description of the type of work performed in exchange for them.  It is undisputed that

Destiny did not contribute to the Funds for any of the hours underlying the amounts in the First American checks.

Vargas included the majority of the First American checks in his audit. He excluded First American checks that were issued to Daniel and/or Deshon McDuffie and First American checks that were clearly issued for non-painting services;[4] however, he included the rest. Vargas testified that he included all First American checks for which there was no explanation as to the type of work performed. Vargas Dep. 22:8-23:4. Vargas issued his audit on June 24, 2008. It indicated that there were four categories of possible additional reportable hours for which contributions and dues were owed.

Category I was derived mainly from First American checks and a few Charter One checks. It consisted of 1221.65 alleged under-reported hours of twelve Destiny employees on behalf of whom Destiny made some contributions.

Category II was derived mainly from First American checks and a few Charter One checks. It consisted of 2680.75 alleged under-reported hours of 43 individuals for whom Destiny failed to make contributions. Some of the 43 individuals were Destiny employees and some did not appear in Destiny's payroll records.

Category III was derived from checks written to "cash" from both the First American and Charter One accounts and consisted of 1508.25 alleged under-reported hours for unnamed individuals.

Category IV was derived from the First American checks, the Charter One checks and Destiny's payroll journals and consisted of 2359.25 alleged under-reported hours for two named

---

[4] Vargas excluded, for example, checks written to a local church for donations. He was able to discern the nature of such checks because of a notation on the faces of the checks.

District 30 apprentices who performed covered painting work in District 14's geographic jurisdiction.

In total, the audit report claimed delinquent contributions of $81,659.13 and liquidated damages, as provided for in the CBA, of $12,163.48.

## II.    The Dispute over the Vargas Audit Procedures

The Funds argue that the First American account was a business account that belonged to Destiny and that all checks Destiny wrote from this account, including those written to cash, were used to pay bargaining unit employees for covered work.  The Funds also argue that Destiny used checks written to cash from the Charter One account to pay bargaining unit employees for covered work.  The defendants contend, however, that the First American account was McDuffie's personal account that he used it to pay individuals who performed non-covered work for him in his individual capacity.  They maintain that the First American checks written to cash were used to purchase building materials for McDuffie's personal real estate projects.

### A.    Evidence Supporting the Funds' Contention

"Destiny Decorators, Inc." is the name listed on the First American account and printed on the checks and McDuffie's name does not appear on any of the documents related to the account.  The few 1099s and single W-2 that defendants eventually produced[5] for the work underlying the First American checks were issued by Destiny, not McDuffie.

The Funds also proffer three affidavits.  The first is from Herman Rogers, a First American and Charter One payee who performed painting work for Destiny from April 2006

_____

[5] While Destiny did not produce any tax documents in response to Vargas' request or to the subpoena, Destiny did eventually produce seven 1099s and a single W-2, submitting these documents to the court in conjunction with Destiny's response to the Funds' motion for summary judgment.

until approximately September 2006. Affidavit of Herman Rogers ¶¶ 5, 28, attached as Ex. 8 to Pls.' L.R. 56.1 SoF (hereinafter "Rogers Aff."). Rogers testified that he was paid for several weeks of this work in cash and for the remainder of the time in checks. *Id.* ¶¶ 9-13, 15-17, 19. The second affidavit is from Charles Jackson, a former Destiny employee and another First American and Charter One payee. Affidavit of Charles Jackson ¶ 5, attached as Ex. 6 to Pls. L.R. 56.1 SoF (hereinafter "Jackson Aff."). Jackson testified that he performed painting work for Destiny from March 2007 until August 2007. *Id.* ¶¶ 5-6. He stated that he was paid mostly with cash and with an occasional check until August, when Destiny began paying him with Charter One checks. *Id.* ¶¶ 9-10. The third affidavit is from David Johnson, a former Destiny employee and another First American payee and Charter One payee, who testified that he performed painting work for Destiny from April 2007 until July 2007. Affidavit of David Johnson ¶¶ 8-22, 25, attached as Ex. 7 to Pls.' L.R. 56.1 SoF (hereinafter "Johnson Aff."). Johnson stated that he was paid in cash for five weeks of that period and with checks for the remainder. *Id.* It is undisputed that Destiny did not contribute for any of the hours worked by Herman Rogers or David Johnson, and that Destiny did contribute for hours worked by Charles Jackson for the month of August 2007.

### B. Evidence Supporting the Defendants' Contention

McDuffie testified that the First American account was a "private," "personal" account that "ha[d] nothing to do with the union workers." Deposition of Daniel McDuffie 22:24-23:9, 46:4-8, attached as Ex. 11 to Pls.' L.R. 56.1 SoF (hereinafter "McDuffie Dep."). He testified that the account was his "personal account even though it had Destiny['s name on it]," *id.* at 59:3-4, and that "[e]very check out of [the First American account] had nothing to do with the painters." *Id.* at 29:12-14. Rather, McDuffie maintained that the First American payees

performed driving, building and electrical services for him in his individual capacity. *Id.* at 28:14-33:16. He stated that Destiny never paid any of its employees in cash and that the checks written to "cash" were used to purchase building supplies that he used in his personal real estate projects. *Id.* at 12:17-19:2.

### III. The Taylor Report

Destiny hired Ayton Taylor ("Taylor"), a Certified Public Accountant, to review Destiny payroll records to determine whether Destiny made the required contributions to the Funds for the time period covering October 1, 2005 through August 31, 2007. Taylor issued a report on December 11, 2008 in which he concluded that Destiny did not owe any delinquent contributions to the Funds. Taylor did not include any checks for which he could not be sure that the underlying work was covered under the CBA. Taylor concluded that the Vargas audit was not consistent with traditional accounting principles because Vargas included all the First American checks in the audit when it was not clear that these checks were issued for work covered under the CBA.

### LEGAL STANDARD

Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). To determine whether any genuine fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record. Fed. R. Civ. P. 56(c) advisory committee notes. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp.* v. *Catrett*, 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). In response, the non-moving party cannot rest on bare pleadings alone but must use the

evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia* v. *Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). A material fact must be outcome determinative under the governing law. *Insolia,* 216 F.3d at 598-99. Although a bare contention that an issue of fact exists is insufficient to create a factual dispute, *Bellaver* v. *Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000), the court must construe all facts in a light most favorable to the non-moving party as well as view all reasonable inferences in that party's favor. *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 255, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). On cross-motions for summary judgment, the court must consider the merits of each motion and assess the burden of proof that each party would bear on an issue at trial. *Santaella* v. *Metro., Life Ins. Co.*, 123 F.3d 456, 461 (7th Cir. 1997).

Summary judgment rules "assist the court by organizing the evidence, identifying undisputed facts, and demonstrating precisely how each side propose[s] to prove a disputed fact with admissible evidence." *Markham* v. *White*, 172 F.3d 486, 490 (7th Cir. 1999). The rules also "assist the parties by imposing some discipline on the pretrial process and facilitating an early end to cases that do not require a full trial." *Id.* Although summary judgment rules impose a limited burden on lawyers, the judicial system as a whole is better served if pre-trial organization occurs sooner in the litigation process rather than later. *Id.*

Northern District of Illinois Local Rule 56.1(a) requires the party seeking summary judgment to submit, among other things, a statement of material facts, which consists of short, numbered paragraphs and specific references within each paragraph to the affidavits, parts of the record, and other supporting materials relied upon to support the facts set forth in that paragraph. L.R. 56.1(a)(3). The nonmoving party must then submit a concise response to the movant's statement of facts. *Id.* Material facts improperly denied by the nonmoving party are deemed

admitted by the court. *Id.*

## ANALYSIS

Before reaching the merits of the motions for summary judgment, the court will address certain deficiencies in the defendants' response to plaintiffs' Local Rule 56.1 Statement of Uncontested Facts. The court agrees with the Funds that the defendants' responses to ¶¶ 17, 20, 21, 25, 26, 29, 30, 32, 33, 35, 37, 43, 44, 48, 50, 51, 53, 59 are improper because they fail to properly support their denials with citations to the record.[6] *See Smith* v. *Lamz*, 321 F.3d 680, 683 (7th Cir. 2003) ("[A] mere disagreement with the movant's asserted facts is inadequate if made without reference to specific supporting material."). Because the court is entitled to expect strict compliance with Local Rule 56.1 procedures, *Ammons* v. *Aramark Uniform Services, Inc.*, 368 F.3d 809, 817 (7th Cir. 2004), it deems these paragraphs admitted. *See Smith*, 321 F.3d at 683 (ruling that the district court acted within its discretion when it deemed defendant's statement of facts admitted because the plaintiff failed to support controverted or additional facts with citations to admitted evidence); *Jupiter Aluminum Corp.* v. *Home Ins. Co.*, 225 F.3d 868, 871 (7th Cir. 2000) ("An answer that does not deny the allegations in the numbered paragraph with citations to supporting evidence in the record constitutes an admission."); *Markham*, 172 F.3d at 490 (ruling that the district court acted within its discretion when it disregarded

---

[6] The Funds also object to defendants' responses to ¶¶ 23, 31, 39, 45-47, 49, and 64 of Plaintiffs' Local Rule 56.1 Statement of Uncontested Facts, arguing that these responses improperly rely on a report issued by Ayton Taylor, an individual who was hired by defendants to review an audit done for the Funds and to determine whether Destiny owed any delinquent contributions to the Funds. Specifically, the Funds argue that "Taylor misunderstood the [Funds'] audit to such a degree that his discussion of the audit cannot be relied upon in denying Plaintiffs' Statement of Facts." Pls' Local Rule 56.1(a) Reply to Defs' 56.1(b)(3) Resp., at 4. The Funds argument is unavailing. While they are free to contest the validity of the Taylor report in their substantive arguments, it is not appropriate to do so in support of a request to admit paragraphs of a Local Rule 56.1 statement of facts. Because the defendants provide specific references to the record to support their disagreement with the allegations contained in the above paragraphs, the court will not deem admitted any of these paragraphs. *See* Local Rule 56.1(b)(3)(B).

depositions and other discovery materials that appeared only in the defendant's supporting brief); *Waldridge* v. *Am. Hoechst Corp.*, 24 F.3d 918, 924 (7th Cir. 1994) (ruling that district court acted within its discretion in granting summary judgment to defendant based on plaintiff's failure to comply with Local Rule 56.1).

Both parties argue that they are entitled to summary judgment on the issue of whether Destiny is liable for delinquent contributions for the hours listed in the Vargas audit. They also each contend that they are entitled to summary judgment on the issue of whether the court should pierce the corporate veil and hold defendant McDuffie personally liable for the alleged delinquent contributions. The court grants summary judgment to the Funds on both issues.

## I. The Funds' Claim for Unpaid Contributions

The Funds argue that Destiny was required to make contributions for the hours underlying the First American checks, the hours underlying the First American and Charter One checks written to "cash," and for the hours worked by two District No. 30 apprentices. Relying on the burden-shifting structure established under Section 1059 of ERISA, the Funds maintain that because they can show that covered work was performed during some of these hours and because defendants cannot show precisely which of these hours were spent performing covered work, the Funds are entitled to contributions for all of these hours, as calculated by the Vargas audit.

### A. Section 1059 of ERISA Burden of Proof

Section 1059 of ERISA requires an employer to maintain time records or similar records of hours worked by each of its employees in order to permit ERISA plans to calculate benefits due and to fulfill their reporting duties. *See Cent. States Pension Fund* v. *Cent. Transp., Inc.*, 472 U.S. 559, 573, 105 S. Ct. 2833, 86 L. Ed. 2d 447 (1985); *Ill. Conference of Teamsters and*

*Employers Welfare Fund* v. *Steve Gilbert Trucking*, 71 F.3d 1361, 1367 (7th Cir. 1995) (citing 29 U.S.C. § 1059(a); *Brick Masons Pension Trust* v. *Indus. Fence & Supply*, 839 F.2d 1333, 1338 (9th Cir. 1988); and *Combs* v. *King,* 764 F.2d 818, 822 (11th Cir. 1985)). These records must be contemporaneous time records that reflect the type of work performed, the date the work was performed, and the work location. *See Laborers' Pension Fund* v. *RES Envtl. Serv., Inc.*, 377 F.3d 735, 739 (7th Cir. 2004).

If the Funds can establish that Destiny violated Section 1059's record-keeping requirements and also establish that Destiny failed to make contributions for employees covered under the CBA, a presumption arises in favor of the Funds regarding the extent of damages. *Chi. Dist. Council of Carpenters Pension Fund v. Reinke Insulation Co.*, 347 F.3d 262, 265 (7th Cir. 2003); *Chi. Steel & Crane, Inc.* v. *Structural Ironworkers Local No. 1 Welfare Fund*, No. 00-C-1615, 2002 WL 1610980, at *6 (N.D. Ill. July 22, 2002) (citing *Combs,* 764 F.2d at 826-27). Indeed, the Funds need only "'produce[ ] sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference,' which, in turn, shifts to the employer the burden to produce evidence of the precise amount of work performed or evidence to negate the reasonableness of the inferences to be drawn from the Funds' evidence." *Chicago Steel & Crane, Inc.*, 2002 WL 1610980, at *6 (citation omitted).

Under this burden-shifting structure, "sufficient evidence" is that which proves the "fact of damage" to a certainty. *Id.* That is, the Funds must prove that the individuals for which they seek to recover contributions performed at least some covered work during the audit time period. *See, e.g.*, *Brick Masons*, 839 F.2d at 1338-39 (reversing denial of damages to trust funds, stating in part that "[h]ere, as in *Combs* and *Anderson*, the fact of damage is certain" because it was undisputed that the Trust Funds received no contributions for the 35 employees in question, even

11

though 13 of those employees did some covered work during the relevant time period); *RES Envtl. Serv., Inc.*, 377 F.3d at 739.

The Funds argue that Destiny's failure to produce payroll documents such as time sheets and cash disbursement records, along with their failure to maintain any records with respect to the First American checks, evidences a violation of Section 1059. The Funds further argue that they can conclusively prove the fact of damage with respect to each of the four categories in the Vargas audit, offering several arguments to support their contention.

### B.    Categories I, II & III of the Vargas Audit

Categories I and II of the Vargas Audit, which were calculated based on First American checks and some Charter One checks, contain alleged under-reported hours worked by both confirmed Destiny employees and individuals who do not appear in any of Destiny's records. Category III contains alleged under-reported hours worked by unnamed individuals that were calculated based on First American and Charter One checks written to "cash." It is undisputed that Destiny did not make contributions for any of the hours underlying the First American checks or the checks written to "cash." The Funds argue that because at least some of these checks were issued for covered work, the fact of damage with respect to Categories I, II & III is certain.

To support their contention that some covered work was performed in exchange for First American checks and for cash, the Funds rely on the Rogers, Jackson and Johnson affidavits. Rogers, Jackson and Johnson, all of whom are First American payees, each testified that he performed covered painting work for Destiny in exchange for checks and cash during the relevant time period. Rogers Aff. ¶¶9-13, 15-17, 19; Jackson Aff. ¶¶5-6, 9-10; Johnson Aff. ¶¶8-22, 25. The Funds also rely on defendants' admission that Robert Holden, a confirmed Destiny employee and First American payee for whom Destiny did not make contributions, performed some covered

work during the relevant time period.  Defs' Resp. to Pls.' L.R. 56.1 SoF ¶40.

Defendants deny that Rogers or Jackson ever worked for Destiny, but provide no support for their denials.[7]  Further, they admit that both Holden and Johnson performed covered work for Destiny, but deny that Destiny was required to pay contributions for either individual. Defendants claim that Johnson was a "90 day trainee" and that Holden was a "retiree who worked less than 40 hours a week," and argue that neither individual falls within the bargaining unit covered by the CBA.  Defendants, however, offer no evidence to support these claims, nor do they point to any provision in the CBA indicating that contributions are not required for trainees and/or retirees.  Instead, they rely solely on McDuffie's deposition, in which he testified that the First American account was his personal account, that the First American checks were only used to compensate individuals who performed non-covered services for him in his individual capacity, and that the checks written to "cash" from the First American account were used to purchase building materials for his real estate projects.  McDuffie Dep. at 12:17-19:12.

McDuffie's testimony contains generalized and conclusional allegations that defendants cannot support, and as such, cannot even raise an issue of fact with respect to the First American checks or the checks written to "cash."  *See RES Envtl. Serv., Inc.*, 377 F.3d at 739 (holding that an employer's affidavit stating that five employees did not perform covered work was insufficient to create a genuine issue as to hours listed in an audit because the affidavit contained "generalized and conclusory allegations" that "fail[ed] to introduce any factual assertion to dispute the audit's findings").  McDuffie's testimony fails to present any specific evidence to dispute the claims of

---

[7]The court cannot accept defendants' denials, as it is undisputed that Rogers and Jackson were both compensated with Charter One checks and it is likewise undisputed that Destiny made contributions to the Funds on behalf of Jackson for the month of August 2007.

the three individual affiants or to prove that Destiny was not required to make contributions on behalf of Robert Holden; rather, it simply restates the defendants' larger argument that Destiny did not compensate its employees with First American checks or cash. In the total absence of corroborating evidence, such self-serving non-specific testimony is insufficient to carry the defendants' burden at the summary judgment stage. *See Lujan* v. *Nat'l Wildlife Fed'n*, 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990) ("The object of [summary judgment] is not to replace conclusory allegations of a complaint with conclusory allegations of an affidavit."); *RES Envtl. Serv., Inc.*, 377 F.3d at 739.

As defendants have not provided any specific evidence to support McDuffie's self-serving testimony, the court finds that the Funds have met their burden of proving the fact of damage with respect to the hours underlying the First American checks and the checks from both accounts written to "cash," as listed in Categories I, II and III of the Vargas audit. It is undisputed that Destiny did not make contributions for such hours, and the Funds' evidence is sufficient to establish that some of these hours were spent performing covered work.

Although the Funds have established that some covered work was performed, they are unable to prove the extent of such work because of Destiny's failure to keep adequate records. Section 1059 requires Destiny to keep contemporaneous time records for each of its employees. *See Steve Gilbert Trucking*, 71 F.3d at 1367. Destiny, however, did not produce a single employee time sheet and admits that it has no records pertaining to the First American checks. Of the fifty-seven First American payees, only sixteen even appear in Destiny's payroll records. Moreover, Destiny was able to produce, after the close of discovery, 1099s for only seven First American payees, and a W-2 for only one of them. Finally, Destiny did not produce a single cash disbursement record or a single receipt to demonstrate that any of the checks written to "cash"

14

were used to make retail purchases. Destiny's failure to produce the above-described documents, along with its complete failure to keep records of the First American checks, evidences a clear violation of Section 1059.

Because Destiny violated its statutory duty under ERISA to keep accurate records and fails otherwise to come forward with any evidence of the extent of covered work underlying the hours in Categories I, II and III, the Funds are entitled to recover the unpaid contributions for these categories, as provided for in the Vargas audit. *See RES Envtl. Serv., Inc.*, 377 F.3d at 739.

### C.    Category IV of the Vargas Audit

Category IV contains alleged under-reported hours of two apprentices from Painters District Council No. 30 ("District No. 30") that were calculated based on First American and Charter One checks. It is undisputed that these District No. 30 apprentices performed covered painting work for Destiny during the relevant time period and that Destiny made no contributions to either the District No. 30 pension fund or to the Funds for the work. It is also undisputed that the District No. 30 pension fund was not accepting contributions during the relevant time period.

Article VII, Section 2(d) of the CBA requires Destiny to make contributions to the Pension Fund for covered work performed by covered employees, regardless of geographic location, unless payment was made to an applicable fund in the geographic area where the work was performed. The Funds argue that because Destiny did not make contributions to the District No. 30 pension fund on behalf of the District No. 30 apprentices, and because the apprentices are included in the definition of "bargaining unit" in the CBA, Destiny was required by Section 2(d) to make contributions to the Funds on behalf of these individuals. Defendants argue, however, that the apprentices are not included in the definition of "bargaining unit," and therefore contend that Destiny was not required to make contributions on behalf of these individuals.

Article III, Section 1 of the CBA defines "bargaining unit" as "all . . . apprentice[s] . . . who are employed to do such work by the present and future Employer members of the Association in that area of Chicago, Cook, Lake, Will, and Grundy Counties, Illinois, and whatever additional jurisdiction might be awarded the union."  Relying on an affidavit from a union official and Fund trustee, *see* Fitzmaurice Aff. ¶5, the Funds contend that the District No. 30 apprentices fall within the definition of "bargaining unit" because the definition includes individuals who belong to District No. 14, those who belong to other Painters Union district councils, and those who are not union members.  Defendants argue that the definition only includes District No. 14 employees because the language does not directly refer to individuals who are not members of District No. 14.  Despite this, because of their failure to comply with L.R. 56.1, defendants are deemed to have admitted that in the past, the Funds have required contributions for District No. 30 apprentices when they work within the geographical jurisdiction of District No. 14.

When construing a provision of a collective bargaining agreement in the context of an ERISA claim, courts are to apply federal common law rules of contract interpretation.  *Cent. States, Se. and Sw. Areas Pension Fund* v. *Kroger Co.*, 73 F.3d 727, 731 (7th Cir. 1996).  A court must first determine whether the provision is ambiguous, which is a question of law.  *Id.* at 732. A provision is ambiguous if it is susceptible to more than one reasonable interpretation.  *Id.* (citing *Brewer* v. *Protexall, Inc.*, 50 F.3d 453, 458 (7th Cir. 1995)).  Ambiguous provisions are to be interpreted by the trier of fact.  *Id.* (citing *Jos. Schlitz Brewing Co.* v. *Milwaukee Brewery Workers' Pension Plan*, 3 F.3d 994, 999 (7th Cir. 1993), *aff'd*, 513 U.S. 414, 115 S. Ct. 981, 130 L. Ed. 2d 932 (1995)).  If the provision is unambiguous, then a court can declare its meaning as a matter of law.  *Id.*  The definition of "bargaining unit," when read in conjunction with Article VII,

16

Section 2(d), is unambiguous.  While defendants are correct to point out that the definition of bargaining unit does not reference non-District No. 14 employees, the presence of Article VII, Section 2(d), which accounts for a situation where Destiny would have to pay contributions to another pension fund, makes clear that the parties contemplated the possibility that individuals from other unions and/or bargaining units might perform work for Destiny.  This language indicated that the definition of "bargaining unit" includes all apprentices, regardless of union membership, who performed covered painting work for Destiny.

Because it is undisputed that Destiny did not make contributions on behalf of the District No. 30 apprentices, and because the court finds that these apprentices were covered under the CBA, the fact of damage with respect to Category IV is certain.  Moreover, because defendants have offered no evidence to suggest that any of the hours in Category IV were spent performing non-covered work, the Funds are entitled to contributions for all hours contained in Category IV, as calculated by the Vargas audit.  *See RES Envtl. Serv., Inc.*, 377 F.3d at 739.

Accordingly, the court will grant summary judgment in favor of the Funds for all of the unpaid contributions listed in the Vargas audit.

**II.     The Funds' Request to Pierce the Corporate Veil**

Both parties argue that they are entitled to summary judgment on the Funds' claim to pierce the corporate veil.  The Funds argue that because McDuffie commingled his personal assets with those of Destiny in the First American bank account, the separate personalities of McDuffie and Destiny no longer exist.  They further argue that McDuffie sanctioned a fraud and promoted an injustice by engaging in a scheme to withhold benefits from Destiny employees.  Defendants maintain their argument that the First American account was McDuffie's personal account, which was kept entirely separate from Destiny's affairs.  They deny that McDuffie

engaged in any scheme to deceive or defraud Destiny employees.

### A. Requirements for Piercing the Corporate Veil in the ERISA Context

In cases involving pension benefits protected by ERISA, "there is a federal interest supporting disregard of the corporate form to impose liability." *Lumpkin* v. *Envirodyne Indus., Inc.*, 933 F.2d 449, 460 (7th Cir. 1991) ("[T]he underlying Congressional policy behind ERISA clearly favors the disregard of the corporate entity in cases where employees are denied their pension benefits."). Accordingly, "the corporate veil may be pierced more easily in ERISA cases than in pure contract cases in order to promote the federal policies underlying the statute." *Id.* at 461.

ERISA articulates no special rules regarding officer or shareholder liability, *see Plumbers Pension Fund, Local 130* v. *Neidrich*, 891 F.2d 1297 (7th Cir. 1989), and the Seventh Circuit applies Illinois law to determine the issue. *Levit* v. *Ingersoll Rand Fin. Corp.*, 874 F.2d 1186, 1193-94 (7th Cir. 1989). Illinois law permits a court to pierce the corporate veil if two conditions are satisfied: "first, there must be such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist; and, second, circumstances must be such that an adherence to the fiction of separate corporate existence would sanction a fraud or promote injustice." *Hystro Prods., Inc.* v. *MNP Corp.*, 18 F.3d 1384, 1388-89 (7th Cir. 1994). The first condition is satisfied with evidence of misrepresentation, undercapitalization, commingling of assets or identities, failure to operate at arm's length, failure to comply with corporate formalities and/or failure to keep adequate corporate records. *Sea-Land Servs., Inc.* v. *Pepper Source*, 941 F.2d 519, 521 (7th Cir. 1991); *Chi. Dist. Council of Carpenters Pension Fund* v. *Sunshine Carpet Servs., Inc.*, 856 F. Supp. 1113, 1118 (N.D. Ill. 1994) (citing *Lumpkin*, 933 F.2d at 463). The second condition is satisfied with evidence of fraud or injustice. *Sunshine*

*Carpet*, 856 F. Supp. at 118; *see also Chi. Dist. Council of Carpenters Pension Fund* v. *Ceiling Wall Sys., Inc.*, 915 F. Supp. 939, 942 (N.D. Ill. 1996) ("Illinois law requires only that in order to satisfy the second prong there be 'some element of unfairness, something akin to fraud or deception or the existence of a compelling public interest.'") (citation omitted).

### B. Destiny and McDuffie's Unity of Interest and Ownership

There is such a unity of interest and ownership between Destiny and McDuffie that the separate personalities of the corporation and the individual no longer exist. First, for the time period covering October 1, 2005 through August 31, 2007 and throughout this litigation, McDuffie has misrepresented the nature of the First American account. He has maintained, despite clear evidence to the contrary, that the account was strictly a personal account that he used to compensate individuals who worked on his personal construction projects. McDuffie Dep. 28:14-33:16. Second, McDuffie, by his own admission, has commingled his personal funds with those of Destiny. It is undisputed that the First American account was used by Destiny to pay its employees, yet McDuffie still testified repeatedly that the account contained his personal funds. *Id.* at 59:3-4. Even if the court were to credit McDuffie's testimony that the account only contained his personal funds, the fact remains that it was used to compensate Destiny employees for covered work. McDuffie's testimony, therefore, would amount to an admission that he used personal funds to compensate Destiny employees and therefore failed to adhere to corporate formalities. Either way, it is clear that McDuffie commingled his personal funds with those of Destiny.

Further, Destiny's failure to keep any records pertaining to the First American account makes it impossible to determine which First American checks were issued by Destiny for covered work and which were issued by McDuffie in his personal capacity. While the Funds'

evidence clearly establishes that some of these checks were issued by Destiny, McDuffie's testimony also indicates that some of them were likely issued by him for other purposes. *Id.* at 28:14-33:16. Because Destiny failed to keep any records pertaining to the First American account, however, there is no way to determine the purpose for which any of the checks were issued. All of this evidence concerning the First American account makes clear that the separate personalities of Destiny as a corporation and McDuffie as an individual no longer exist.

### C.  Fraud and Injustice Arising from McDuffie's Actions

By representing that the First American account was strictly a personal account and consequently failing to pay contributions for any of the checks written from that account, McDuffie has deprived eligible Destiny employees of pension and other benefits. This deprivation, and McDuffie's consequential unjust enrichment, is the sort of fraudulent "'wrong' beyond the creditor's inability to collect" sufficient to satisfy the second condition needed to pierce the corporate veil. *See Hystro Products, Inc.*, 18 F.3d at 1390 ("Canvassing Illinois law, the *Sea-Land* court found that Illinois had pierced corporate veils to avoid injustice when failure to do so would: unfairly enrich one of the parties . . .") (citing *Sea-Land Servs., Inc.*, 941 F.2d at 524). Indeed, McDuffie sanctioned an injustice on each of the individuals for whom Destiny failed to make contributions. *See Chi. Dist. Council of Carpenters Pension Fund v. Ceiling Wall Systems, Inc.*, No. 95-C-4809, 1999 WL 47078, at *34 (N.D. Ill. Jan. 20, 1999) ("[A]n injustice to Defendants' carpenter employees has resulted from the failure to make contributions . . . making it appropriate to pierce the veil to reach Machon personally."). As such, he should be held personally liable for Destiny's unpaid contributions.

Accordingly, because both conditions required to pierce the corporate veil are satisfied, the court will grant summary judgment to the Funds on their piercing claim.

**III.    Damages**

In addition to the delinquent contributions, the Funds have requested $12,136.48 in liquidated damages, as provided for by the CBA, interest, and reasonable attorneys' fees and costs as provided  under 29 U.S.C. § 1132(g)(2) and the CBA.  The Funds are entitled to all of this relief under 29 U.S.C. § 1132(g)(2).

**CONCLUSION AND ORDER**

For the reasons explained above, plaintiffs' motion [#47] is granted and defendants' motion [#50] is denied.  Plaintiffs are directed to submit a proposed order.  This case will be called for a prove up hearing on October 22, 2009 at 9:30, at which time defendants may offer objections, if any, to the requested judgment order.

Dated: September 30, 2009                Enter: _____

                                         JOAN HUMPHREY LEFKOW
                                         United States District Judge